IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| UNITED STATES OF AMERICA, | ) | |
|---|---|---|
| | ) | |
| v. | ) | 1:08CR414-1 |
| | ) | |
| SALOMAN GONZALEZ GONZALEZ, | ) | |
| | ) | |
| Defendant. | ) | |

ORDER AND OPINION

BEATY, Chief District Judge.

This matter is before the Court on a Motion to Suppress [Document #18] wherein the Defendant Saloman Gonzalez Gonzalez ("Defendant") moved to suppress any and all evidence recovered from a search of a residence pursuant to his purported consent. A hearing was held on the motion on January 6, 2009, in which the parties were notified that the Court would deny Defendant's Motion. The Court now issues the present Order and Opinion to memorialize its factual findings and reasoning for denying the Motion.

I.  FACTUAL BACKGROUND

In addition to the briefs submitted by both parties, at the hearing on this matter the Government presented evidence regarding the facts at issue and the encounter between Defendant and DEA Task Force Officers on October 10, 2008. Although the Government and Defendant agreed upon the basic events at issue, they differed with respect to many significant details. After assessing the testimony presented at the hearing, the Court found the Government's evidence credible. Based upon a preponderance of the evidence presented at the hearing, the Court finds the relevant facts to be as follows.

On October 10, 2008, Defendant was residing at a residence located at 3004 Harrison Valley Trail, Elon, North Carolina. On that day, DEA Task Force Officer Eric Goodykoontz, Detective Jackie Wayne Fortner of the Alamance County Sheriff's office, and approximately four other federal agents and local officers went to the residence at 3004 Harrison Road to conduct a knock and talk to investigate suspected drug trafficking activity as part of a larger investigation conducted by the DEA. Upon arriving at the residence, the officers drove their vehicles down the driveway which lead to an attached garage at the side of the house. Being that the actual front and back of the house were not visible upon approach to the residence, at this point, the attached garage was "the front of the house." Officer Goodykoontz and Detective Fortner saw that the garage door was opened. Clearly visible to them from the garage opening was a door to the residence on the opposite side of the garage. The two officers walked inside the garage area and approached the residence door to knock. The remaining four officers were left outside of the garage, out of the line of sight of the door, and positioned around the two sides of the residence. At all times, all of the officers had gear on that identified them as law enforcement. Officer Goodykoontz knocked on the door once and when Defendant answered, Officer Goodykoontz displayed his DEA credentials and told Defendant that the officers were investigating a narcotics complaint about the residence. Officer Goodykoontz next asked Defendant if he could come into the residence to talk about the complaint. In response, Defendant made no verbal indication, however, Defendant pushed the door open and signaled with a gesture of his hand for Officer Goodykoontz and Detective Fortner to enter the residence.

After the two officers entered the residence, they moved into the kitchen with Defendant. Once the officers were inside, Defendant was asked if anyone was in the residence, to which Defendant shook his head no. Officer Goodykoontz then asked Detective Fortner to ask the other officers to come into the home to conduct a protective sweep of the residence for other persons. Detective Fortner left the residence briefly and returned with the other officers as requested. The Officers conducted a protective sweep of the residence while Detective Fortner remained in the kitchen with the Defendant. During the protective sweep, the officers had their weapons out and at the low ready position as they looked through the residence, and then holstered their weapons when the residence was cleared. At no time were the officers' weapons pulled from their holsters in the presence of Defendant, nor were any weapons pointed at Defendant, nor was Defendant handcuffed. After the sweep, Officer Goodykoontz returned to the kitchen and asked Defendant if there was any contraband, drugs or weapons in the house, using both the English and Spanish words for drugs and weapons. In response, Defendant shook his head no. Officer Goodykoontz then asked Defendant if the officers could look through the residence to make sure that there were no drugs, weapons, or contraband in the residence. Defendant said "okay," nodded, and threw up his hands in a gesture indicating that the officers could look through the residence. At no point during this exchange between Officer Goodykoontz and Defendant did Defendant indicate that he did not understand what he was being asked. When Defendant was asked for consent to search the residence, no threats were made towards Defendant by the officers, nor did they make any physical contact with Defendant. The officers then proceeded to search the residence.

During the search, Defendant remained in the kitchen of the residence with Detective Fortner. Defendant and Detective Fortner had general conversation in the kitchen during which the two had numerous exchanges in English. Detective Fortner asked Defendant if the stove was hot and if Defendant was cooking something, to which Defendant replied "yes," and that he was cooking breakfast. Defendant asked if he could get a drink of water, and Detective Fortner replied "sure, this is your house." The detective then said "just don't reach for no knives," to which Defendant laughed and said "no," and then proceeded to get and drink a glass of water. Detective Fortner then noticed a couple of cellular telephones on the counter and bar in the kitchen, and asked Defendant if the telephones belonged to him, to which Defendant replied "yes." Officer Goodykoontz then contacted DEA Task Force Officer Alan Balog who obtained the numbers assigned to the telephones and advised Goodykoontz that one of the telephones was linked to a wiretap of an unidentified male that was a subject of the DEA's ongoing investigation.[1] Based on this information, the officers seized the telephone, and Officer Balog asked that the Defendant be arrested and taken to the Alamance County Jail. Detective Fortner, who was told to place Defendant under arrest, moved behind Defendant, asked him to stand up, and told Defendant that he needed to place handcuffs on him. Defendant responded by raising his hands up, to which Detective Fortner, while standing behind Defendant, told him to put his hands behind his back. Defendant complied, was handcuffed and then taken outside of the residence. Detective Fortner continued to have general

---

[1] It is uncertain from the evidence presented whether Officer Balog was at the residence with the other officers or if he was contacted by Officer Goodykoontz via telephone. Nevertheless, the evidence presented does indicate that Officer Balog was contacted via telephone while Officer Goodykoontz and the other officers were at the residence.

4

conversation with Defendant in English, asking him if the barking German shepherd at the house nearby was a mean dog, to which Defendant replied "no."

While Defendant was being asked about the telephones, and information was being gathered about the telephones, the other officers continued to search the residence. No contraband, weapons, or drugs were found as a result of the search. The officers, however, did discover a locked safe in a bathroom closet. A K-9 unit was called to the residence and arrived some time after Defendant had been arrested and taken outside. The K-9 came into the house and alerted to the presence of illegal narcotics on the safe. Officer Goodykoontz then asked Defendant if the safe was his, and for the safe's combination, however, Defendant communicated that he did not understand the questions that were being asked of him. At this point Detective Fortner contacted a Spanish-speaking officer by telephone to communicate with Defendant. Defendant thereafter communicated through the translator that the safe was not his and that the officers could search it if they wanted to. The safe was later taken away and opened by a local fire department, and nothing was found inside. Although a translator was needed to facilitate questioning of Defendant as to the safe, with regard to all other exchanges that took place between the officers and Defendant, including the officers' requests to enter the residence and for consent to search the residence, Defendant understood what was being asked of him in English and was responsive to the questions.

In his Motion to Suppress, Defendant contends that he did not give any consent to search the residence, valid or otherwise, and that even if consent was given, it was nonetheless involuntary and thus invalid because Defendant's mere submission to the badge of Officer

5

Goodykoontz and the show of force by the number of officers present negated any knowing and voluntary consent to enter and search the residence.[2] Defendant further contends that since the entry and search were unlawful, the Court should suppress any and all evidence seized or statements derived from questions about items seized from the residence. Thus, the issue before the Court is whether Defendant validly consented to the search of the residence.

II.     LEGAL STANDARD

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. "It is well settled under the Fourth and Fourteenth Amendments that a search conducted without a warrant issued upon probable cause is per se unreasonable . . . subject only to a few specifically established and well-delineated exceptions." Schneckloth v. Bustamonte, 412 U.S. 218, 219, 93 S. Ct. 2041, 2043, 36 L. Ed. 2d 854 (1973) (internal quotation and citation omitted). Moreover, it is well settled that a search conducted pursuant to valid consent is one of the well-recognized exceptions to the Fourth Amendment's general warrant requirement. Id.;

---

[2] The Court notes that in support of his Motion, Defendant contends that the officers signaled and made motions that they wanted to come into the residence, but that the officers did not explain what they wanted in the residence, nor what they wanted with Defendant. Defendant further contends that he did not voluntarily give consent to search the residence, but that he merely submitted to lawful authority. Defendant also contends that he speaks little to no English and that he did not understand what the officers wanted inside the residence when they asked to enter or when they asked for consent to search. However, having considered all of the testimony presented, the Court finds the testimony of Officer Goodykoontz and Detective Fortner credible on these issues with respect to Defendant's understanding of the questions being asked in English and the fact that Defendant gave his consent knowingly and voluntarily when asked by the officers for consent to enter the residence and consent to a search of the residence. Based on a preponderance of the evidence presented at the hearing, the Court has made the factual findings contained in the Factual Background set forth above.

6

United States v. Boone, 245 F.3d 352, 361 (4th Cir. 2001). If challenged, the district court must determine, based upon the "totality of the circumstances," whether consent was knowing and voluntary, which the government must prove by a preponderance of the evidence. See United States v. Mendenhall, 446 U.S. 544, 557, 100 S. Ct. 1870, 1879, 64 L. Ed. 2d 497 (1980); United States v. Buckner, 473 F.3d 551, 554 (4th Cir. 2007). "[W]hether a consent to a search was in fact "voluntary" or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances." Schneckloth, 412 U.S. at 227, 93 S. Ct. at 2048. In this regard, to determine whether consent was voluntary or the product of police coercion, a district court should determine whether based on the totality of the circumstances a person's will was overborne by the actions of law enforcement. Id. 412 U.S. at 226-27, 93 S. Ct. at 2047. Moreover, consent must be more than mere acquiescence to apparent lawful authority. See Bumper v. North Carolina, 391 U.S. 543, 548, 88 S. Ct. 1788, 1791, 20 L. Ed. 2d 797 (1968) (holding that individual did not consent to search of house where "consent" had been given only after official had asserted that he possessed a search warrant); See also, United States v. Smith, 30 F.3d 568, 571 (4th Cir. 1994) (rejecting defendant's argument that consent was motivated by fear of police where suspect was not under arrest, no officer drew his weapon, and no officer threatened or touched the suspect). "In viewing the totality of the circumstances, it is appropriate to consider the characteristics of the accused (such as age, maturity, education, intelligence, and experience) as well as the conditions under which the consent to search was given (such as the officer's conduct; the number of officers present; and the duration, location, and time of the encounter). United States v. Lattimore, 87 F.3d 647, 650

7

(4th Cir. 1996). With regard to language, whether a defendant had the requisite understanding of the English language to consent knowingly to a search is a question of fact to be determined by the trial court. See United States v. Guay, 108 F.3d 545, 549 (4th Cir. 1997); United States v. Santiesteban, 825 F.2d 779, 783 (4th Cir. 1987).

III. ANALYSIS

Applying this standard in the present case, the Court notes as an initial matter that based on the totality of the conversations and exchanges that took place between Defendant and officers Goodykoontz and Fortner, although Defendant did not speak English fluently, he did clearly make indications that he understood the requests from the officers up to the point that Defendant appeared not to understand with respect to questions regarding the safe. By this time, however, Defendant had already been asked to give consent and the search had already been conducted. The Court concludes that Defendant had the requisite understanding of the English language to consent knowingly to a search of the residence.

With regard to the circumstances leading up to and surrounding the request for Defendant's consent, the Court notes that the officers gained entry to the interior of the residence only after they knocked on the door and asked Defendant if they could enter for the purpose of discussing an ongoing investigation into drug activity, to which Defendant responded affirmatively. Moreover, the protective sweep that was conducted by the five officers prior to the request for Defendant's consent was executed for the protection of the officers. At no time during the sweep or when Officer Goodykoontz asked Defendant for consent to search the residence did the officers threaten, display weapons to or point weapons at, use physical force

8

towards, or otherwise make a showing of physical force towards Defendant. In this regard, the Court finds that based upon a totality of the circumstances Defendant's will was not overborne by the actions of law enforcement, and thus, Defendant's consent was not the product of police coercion. Moreover, there is no evidence that the officers' represented that they otherwise had authority to enter and search the house. In this regard, Defendant's cooperation with the officers is evidence of consent and not evidence that Defendant merely acquiesced to apparent lawful authority. Therefore, in light of the totality of the circumstances, the Court finds that Defendant knowingly and voluntarily consented to a search of the residence.

IV. CONCLUSION

For the reasons discussed above, IT IS ORDERED that Defendant's Motion to Suppress [Document #18] is DENIED.

This, the 4 day of March, 2009.

                                                     United States District Judge